FILED

09/24/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 29, 2019 Session

## STATE OF TENNESSEE v. KEVIN WAGGONER

**Appeal from the Criminal Court for Union County**
**No. 5019      E. Shayne Sexton, Judge**

_____

### No. E2018-01065-CCA-R3-CD

_____

The Defendant, Kevin Waggoner, appeals his conviction for second degree murder for which he received an eighteen-year sentence.  On appeal, the Defendant challenges:  (1) the sufficiency of the evidence supporting his conviction; (2) the trial court's failure to grant a change of venue; (3) the trial court's failure to grant a new trial due to juror misconduct; (4) law enforcement's failure to record the statements of the Defendant and the Defendant's son; (5) the admission of testimony from the forensic pathologist related to crime scene reconstruction; (6) the trial court's exclusion of the recording of the Defendant's 911 call; (7) the trial court's exclusion of evidence of the victim's conduct directed at the Defendant and his family; and (8) the trial court's denial of the Defendant's request for access to the audio recordings of the trial.  Upon reviewing the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Mike Whalen (on appeal), Tommy Hindman (at trial), and Scott Lanzon (at trial), Knoxville, Tennessee, for the appellant, Kevin Waggoner.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham Wilson and Tyler Hurst, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that on the night of September 16, 2013, the Defendant shot his neighbor, Mr. Michael Woodby, four times, killing him. The Defendant maintained that he shot the victim after the victim attacked the Defendant's twenty-one-year-old son, Mr. Kolton Waggoner, with a stick. The Defendant was charged with second degree murder, and a jury was unable to reach a verdict in the first trial. During the second trial, eighteen witnesses testified, and 144 exhibits were introduced. We briefly summarize the evidence presented at trial.

### The State's Proof

In August 2010, the victim, his wife, Mrs. Teresa Woodby, and their young grandson moved into their home. The Defendant lived in a home across the highway from the Woodbys with his wife, Mrs. Kennette Waggoner, their daughter, and Mr. Kolton Waggoner. The Defendant operated a firearm store on his property called The Gun Shack, but he closed the store sometime before the shooting. The Waggoners often shot firearms on their property. Mrs. Shirley Muncey, who lived beside the Woodbys, testified that the Waggoners shot their firearms so often that it was as if a gun range was located on their property. The Waggoners also detonated explosives, which shook the neighboring houses.

The Woodbys and the Waggoners maintained an amicable relationship during the first several months. According to Mrs. Woodby, the conflict began after the victim was hospitalized due to heart issues. Following the victim's discharge from the hospital, he went to the Waggoners' home and asked them to stop shooting firearms for a few weeks until he regained his strength. Mrs. Woodby said the Defendant cursed at the victim, stated that the victim could not tell them what to do, "backed [the victim] off with a gun," and ordered the victim off his property. Shortly thereafter, the victim took a basket of tomatoes to the Waggoners and tried to talk to them, but the Waggoners responded in the same manner. The Waggoners continued shooting firearms and detonating explosives.

The Waggoners began video recording the Woodbys using both stationary and handheld video cameras. Mrs. Woodby testified that the Waggoners were recording them "24/7." On numerous occasions, Mrs. Woodby saw Mr. Kolton Waggoner recording her while she was inside her home. The Waggoners recorded the Woodbys' grandson as he was playing outside or waiting for the school bus to arrive. Ms. Jessica Waggoner, who was not related to the Waggoners and drove the bus for the Head Start program in which the victim's grandson was enrolled, and Mr. Derrick Merritt, who drove the bus for the

school in which the victim's grandson was later enrolled, both confirmed the Waggoners' behavior. Ms. Jessica Waggoner observed a boy and an older woman on the Waggoners' property armed when they were video recording. She was so concerned about the safety of the children on the bus due to the Waggoners' behavior that she arranged to pick up the victim's grandson at another location. Even at the new location, she saw a camouflaged vehicle with a video camera on top of the vehicle drive by slowly as if it was recording the bus stop. Ms. Jessica Waggoner testified that the victim was active in the Head Start program and was chairman of the policy council. She said the victim was "really kind and caring" with the children, as well as with his grandson. She never saw the victim threaten anyone.

The Woodbys called the police on the Waggoners over three hundred times, but the Waggoners were never arrested. The Woodbys responded to the Waggoners by begging to be left alone, cursing and yelling at them, and laughing at them. The victim threw rocks at them on one occasion and threatened them on numerous other occasions. The victim attempted to end the dispute on multiple occasions to no avail. He hung a dry erase board in front of the Woodbys' windows and wrote messages such as, "Love thy neighbor"; "Please leave me alone"; "I'm not bothering you"; and "Can't we just end this[?]" Mrs. Woodby said the Waggoners followed her and her grandson around town, followed her to work, and waited down the highway for her to return home from work. As a result, she had the victim post a sign in their yard that read, "Stalking is a crime." Despite the Woodbys' pleas and the victim's threats, the Waggoners continued to record them.

Numerous audio and video recordings from handheld video cameras made by the Waggoners and illustrating the behavior of the Waggoners and the Woodbys were introduced at trial. Some of the recordings were on a disc entitled "The truth about Highway 370" that was included in a packet sent by the Defendant to the Tennessee Bureau of Investigation ("TBI"), other law enforcement officials, and news outlets three days before the shooting. Mrs. Waggoner provided some recordings to officers on the night of the shooting. Officers also recovered approximately 180 hours of audio recordings and 100 to 200 hours of video recordings during the execution of a search warrant at the Waggoners' residence following the shooting. The audio recordings included the Defendant's own telephone conversations and his conversations with his family.

During a conversation audio recorded on June 8, 2012, after the Defendant had spoken to officers as a result of the Woodbys calling the police, the Defendant discussed the Woodbys with his family and asked Mr. Kolton Waggoner, "Do you think I finally have him more upset with me than you?" Mr. Kolton Waggoner responded, "No," and made a comment that caused the Defendant to laugh. Mrs. Waggoner stated that the

Defendant had "them scared to death," laughed, and said, "You have upset their family. Their way of life." In February 2013, the Defendant contacted the Social Security Administration in an effort to thwart the victim's attempt to obtain disability benefits and referred to the victim as a "pathological liar." On May 27, 2013, the Defendant and the victim were involved in an altercation at a convenience store. On that same day, the Defendant recorded a telephone conversation between himself and another person regarding the victim during which the Defendant stated that he did not understand how someone could be "oblivious" to his surroundings and "how close you are to dying." The Defendant said it was "within his control not to die from me."

On June 6, 2013, the Waggoners video recorded the Woodbys outside with their grandson. The victim placed a sign in his yard stating that video recording was prohibited without his permission. The Waggoners continued to record Mrs. Woodby and her grandson while he played outside. On August 20, the victim became upset with the Waggoners' recording and yelled that the Waggoners were "pedophiles," liked recording children, and to "protect your children." A video recording from the next day showed Mr. Kolton Waggoner walking to his family's mailbox and the victim throwing an object at him, while calling him a "b***h," a "piece of s**t," and a "pedophile." Nine days later, on August 31, the Waggoners recorded the victim as he said he was "begging" them to agree to resolve their differences. The Waggoners did not respond verbally and continued recording the Woodbys.

On September 3, the Waggoners recorded Mrs. Woodby as she was in her yard. She called the Waggoners "sick" and "perverts" and yelled that they had "nothing better to do than to videotape a young child and an old man." She accused them of harassment and bullying. She made a call on her cell phone, stating that the Waggoners were standing in their yard with video camera, "flipping her off," and calling her names. She said "the boy" was on her property earlier. The victim came out of his house and yelled that "the boy" had a gun. Later, while the Waggoners were recording the Defendant as he walked along the Woodbys' side of the highway, the victim yelled, "If you come over here with a gun, I'm gonna drop your a**," and, "You have no business coming over here harassing us."

On September 8, the Waggoners recorded the victim as he was out on his porch yelling about someone on the road with a gun. The victim yelled, "I'm gonna splatter his head all over the road"; "I'll kill that son of a b***h"; and "I'll go to jail, and you'll be dead if you keep coming over here with a gun." The next night, the Waggoners recorded the victim as he cursed them and called them names from his property. The victim yelled, "Stop playing games," and, "I'll put a hole in you."

- 4 -

On September 10, the Waggoners filmed the Woodbys and their grandson outside in their yard while Mr. Kolton Waggoner walked up and down the highway in front of the Woodbys' home with a firearm on his side. The victim ran to the highway and cursed and threatened Mr. Kolton Waggoner, who admitted to possessing a firearm. The Defendant began walking beside Mr. Kolton Waggoner, and Mr. Kolton Waggoner threatened the victim. The Defendant, who had a firearm at his side, told the unarmed victim, "Take one step, and I'll shoot a hole in you're a**." The Defendant had his hand on his firearm while continuing to state "one step" in a low voice. Mrs. Woodby came to the road and yelled that Mr. Kolton Waggoner was harassing her grandson. The police were called, but Mr. Kolton Waggoner gave his firearm to the Defendant before officers arrived.

The Defendant made an audio recording of himself walking along the highway on September 14, two days before the shooting. He stated that the "fat bastard" was walking down the driveway. The victim asked the Defendant to resolve their differences. The Defendant told the victim to leave him and his family alone, and the victim said he would do so. The Defendant continued narrating into the recorder, spending several minutes ranting about the victim and mentioning someone who "ought to hit Tannerite," an explosive.

The Waggoners recorded the Defendant walking up and down the highway during the early evening hours of September 16, the date of the shooting, as Mrs. Woodby arrived home from work. After the Woodbys ate dinner, the victim went for a walk. Mrs. Woodby testified that the victim typically took a walking stick, cigarettes, and a flashlight when he walked. Sometime later, Mrs. Woodby went outside to smoke a cigarette and wait for the victim to return. She heard gunshots, believed that the Waggoners were shooting because they saw her outside, and reentered her home. She did not hear any other noises prior to the gunshots.

The Defendant shot the victim four times, returned to his home, and called 911. He set an audio recorder on his police scanner and recorded the police officers' radio communications regarding the shooting. His recording of the police scanner while officers were responding to the scene was played at trial.

Officers arrived at the scene at approximately 10:15 p.m. When Union County Sheriff's Deputy Lance Thomas exited his patrol car, he saw the Defendant walking down a driveway with a firearm on his side. The Defendant was holding a cell phone, a flashlight, a radio, and a soda bottle. Deputy Thomas ordered the Defendant to put up his hands so officers could secure the firearm. Deputy Thomas had to issue the order three times before the Defendant complied, and at one point, the Defendant, a school resource

officer, stated, "I'm one of you all." After officers secured the Defendant's handgun, they placed him in the back of a patrol car.

Deputy Thomas asked the Defendant for the victim's location, and the Defendant stated that the victim was "down the road." Deputy Thomas looked in the median but did not see anyone. He again asked for the victim's location, and the Defendant said the victim was in the ditch. The Defendant admitted to shooting the victim. Deputy Thomas found the deceased victim lying in a ditch on the Woodbys' side of the highway.

During the investigation, Mr. Kolton Waggoner reported that he had been assaulted. An emergency medical technician ("EMT") examined him at the scene, but he refused to go to the hospital that night for medical treatment.

Officers found a cigarette butt, a stick, a flashlight, and four spent cartridge casings near the victim's body. Two of the spent cartridge casings were in the grass; one was in the grass near the highway; and one was on an area of the highway near the victim's body. The flashlight was on and had holes in the bottom and under the handle. A bottle containing liquid was beside the highway on the Waggoners' side, and a second flashlight was on the Waggoners' side of the highway. Officers collected a projectile that was attached to the victim's skin near his stomach but did not enter his body. Officers located blood in the grass near the victim's body and underneath his body but did not locate any blood on the highway.

The victim's DNA was on the cigarette butt, and his blood was on the stick. A DNA profile consistent with a mixture of genetic material from at least two individuals was on a non-stained area of the stick. The victim was the major contributor, and the minor contributor could not be determined.

TBI Special Agent Jessica Hudson examined the flashlight found near the victim's body and determined that a bullet had passed through it. The hole in the bottom on the flashlight tested positive for lead, indicating that the hole was the bullet's point of entry. Two more holes were inside the flashlight, and the bulb holder tested positive for lead. The bullet exited near the top of the flashlight underneath its handle.

While executing a search warrant at the Defendant's residence, officers recovered multiple handheld video cameras, surveillance cameras, and audio recorders. One of the audio recorders was on the bed of a pickup truck and was recording at the time of the search. The names of the victim and Mrs. Woodby and their respective dates of birth were written on a page in a notebook seized from the residence.

The TBI crime laboratory conducted testing on the Defendant's Glock, Model 19, nine millimeter, semi-automatic pistol; another pistol of the same model and two other semi-automatic pistols from the Waggoners' residence; the four fired cartridge casings found near the victim's body; the bullet found on the victim at the scene; and three bullets removed from the victim's body during the autopsy. Retired TBI Special Agent Steve Scott testified that the four cartridge casings were fired from the Defendant's pistol and that the bullets could have been fired from either of the Glock pistols. A magazine and twelve unfired cartridges were sent with the Defendant's pistol. The unfired cartridges were nine millimeter cartridges loaded with brass-jacketed, hollow point bullets. The four bullets and the four spent cartridge casings were of the same type and design as the unfired cartridges.

Special Agent Scott testified that when the Defendant's gun was fired at the twelve o'clock position, the cartridge casings ejected three to five feet away and to the right and slightly to the rear between the three and five o'clock positions. He said the travel distance once the cartridge casings struck the floor was not measured because the distance was dependent upon the surface struck.

Dr. Christopher Lochmuller conducted the victim's autopsy and determined that the victim died from multiple gunshot wounds. The victim was shot four times on the right side of his body. He sustained gunshot wounds to the right shoulder, the upper right side of the chest near the right shoulder, the right side of the chest next to the right nipple, and the right forearm. The gunshot wounds would have been painful and would have resulted in external bleeding.

One bullet entered the back of the victim's right forearm, struck a bone, and exited through the front of the right forearm. The bullet traveled back to front, right to left, and slightly down. The bullet attempted to reenter the victim on the right side of his abdomen. Dr. Lochmuller noted a scraped area of skin where the bullet contacted the right side of the victim's lower abdomen but did not have enough energy to penetrate the abdomen. He testified that when the victim sustained the gunshot wound, his forearm was down and close to his abdomen, and Dr. Lochmuller agreed that the position of the victim's forearm would be consistent with him holding a walking stick when he sustained the gunshot wound. Dr. Lochmuller said that this particular gunshot wound generally would not be fatal in an otherwise healthy person but noted that the victim had underlying heart disease. The bullet that caused this wound was recovered by law enforcement at the scene.

A second bullet entered the right side of the victim's chest next to his right nipple, damaged his right lung and heart, and stopped under the skin on the left side of his chest. A third bullet entered the victim's upper right chest near the right shoulder; traveled

through a rib, the right lung, the diaphragm, and the liver; and stopped at the fatty structure that holds vessels supplying blood to the intestines.  A fourth bullet entered the lateral aspect of the victim's right shoulder; exited the inside of the right arm near the armpit; reentered on the right side of the chest in the armpit area; traveled through a rib, the diaphragm, and the liver; and stopped in the pancreas.  Dr. Lochmuller said the wounds from the second and third bullet were likely fatal.

Because there was no unburnt gunpowder particles around the entry wounds, Dr. Lochmuller classified the wounds as distant gunshot wounds where the gun was fired from a distance of more than two feet away from the victim.  He believed the bullet that entered the victim's right shoulder passed through another object before doing so.  The entry wound was irregular in shape, and scrapes and fragments from either the bullet or the intermediary object were around the wound.  Dr. Lochmuller examined the flashlight with the holes in it and agreed that it was possible that the victim was holding the flashlight in his left hand when the bullet passed though it prior to striking the victim's right shoulder.

The bullets that entered the right forearm and the right side of the chest next to the right nipple traveled slightly downward, while the bullets that entered the upper right chest next to the right shoulder and the lateral aspect of the right shoulder traveled at a more downward angle.  Dr. Lochmuller testified that because the bullets struck the right side of the victim, the shooter was standing to the victim's right when he fired the shots.  When provided with a scenario in which the shooter was shorter than the victim, Dr. Lochmuller testified that the victim may have been squatting or leaning toward the direction in which the bullets were coming, that the shooter may have been on higher ground than the victim, or that the shooter may have been holding the gun up higher and pointing downward.  According to measurements taken at the scene, the center of the highway was the highest elevation; the highway was slightly higher on the Woodby side than the Waggoner side; and the ditch line where the victim's body was found was the lowest elevation.

On cross-examination, Dr. Lochmuller agreed that he could not determine the sequence in which the shots were fired, the exact position of the victim when he was shot other than the position of his right arm and forearm, and the exact position of the shooter other than that he was to the victim's right.  Dr. Lochmuller also agreed that the victim could have been shot while falling after receiving the initial gunshot wound, which would have explained the downward trajectory.

The Defendant was interviewed by TBI Special Agent Andy Corbett and Detective Steve Rouse during the early morning hours of September 17, 2013.  The Defendant waived his rights and gave a written statement, which he reviewed and signed,

after making multiple corrections. Prior to the interview, the Defendant was wearing an earpiece that, typically, is used in communications through a two-way radio.

The Defendant told the officers that the animosity between the Waggoners and the Woodbys began approximately two and one-half years before the shooting when the Defendant refused to sell a firearm to the victim because the victim was a convicted felon. The Defendant said that when the victim stated that he would send Mrs. Woodby to purchase a firearm, the Defendant informed him that was illegal. The Defendant stated that after the incident, the Woodbys began calling the police on his family and screaming, cursing, and threatening them. The Defendant said that approximately one year prior to the shooting, the victim fired a shotgun from his porch and screamed at the Waggoners, "That's what is going to happen." The Defendant contacted the Department of Children's Services ("DCS") regarding the Woodbys' grandson after the victim threatened Mr. Kolton Waggoner. The Defendant put together packets that included reports and a video recording and sent them to the TBI, other law enforcement agencies, government officials, and news outlets.

The Defendant stated that at approximately 6:30 p.m. or 7:00 p.m. on the evening of the shooting, he was walking on the highway in the area in front of his home. At some point, the victim came outside and cursed and screamed at him. The Defendant denied responding in kind.

The Defendant stated that between 8:30 p.m. and 9:00 p.m., he and his son went for a walk along the highway to spend time together. The victim came out of his home and off his porch and began yelling at them. The Defendant heard a noise that sounded like a baseball bat hitting the asphalt but did not see the victim with a bat or a stick. The victim was approximately twenty to thirty feet behind them and shined a flashlight at them. The Defendant said he shined his flashlight at the victim, who screamed at them, and the Defendant told the victim to leave them alone.

According to the Defendant, the victim rushed at him and Mr. Kolton Waggoner and began swinging a bat or a stick at both of them. The Defendant estimated that the victim struck Mr. Kolton Waggoner two or three times and said he later learned that his son was struck on his arm and neck. The Defendant did not recall being struck but stated that he felt the air of the bat as the victim swung at them. He said he yelled at the victim to leave multiple times but that the victim did not do so. The Defendant stated that he pulled his gun out of its holster, pointed it at the victim, and ordered him to leave, but the victim continued to swing the bat or stick in the Defendant's direction. The Defendant did not know where his son was at the time. The Defendant stated that he "had to stop [the victim] from killing us," so he aimed at the victim's "center mass" and shot four rounds. The victim stopped, "moved to the other side of the ditch of [the highway] on the

north side," and lay down. The Defendant said, "Where everything happened is within close proximity to where I saw [the victim] go into the ditch line." He instructed his wife over a two-way radio to call 9-1-1. He then returned to his home where he called 9-1-1 and requested two ambulances, one for his son and one for the victim.

During the interview, the officers asked the Defendant to indicate his location at the time of the shooting on a drawing of the area. Special Agent Corbett testified that the Defendant indicated that he was on the south side of the highway or the Waggoner side of the highway, which was consistent with his statement. The Defendant never expressed uncertainty or confusion in giving his statement and was allowed to leave following the interview.

The Defendant's wife gave officers contemporaneous video footage taken from a surveillance camera. The shooting was not within the view of the camera, which was directed at the Woodbys' property. The recording showed a fire on the side of the Woodbys' home and someone walking around the fire. The recording also showed someone, who appeared to be the victim, walking along the Woodby side of the highway. Although the Defendant stated that he and his son also were walking along the highway, Special Agent Corbett did not see anyone coming from the Waggoner residence in the recording.

Officers recovered an audio recording of a conversation between the Defendant and his wife after the Defendant returned from his initial interview. The Defendant questioned his wife about telling officers that she had heard five shots when he told them that he had fired four shots. Mrs. Waggoner mocked Mrs. Woodby and Mrs. Woodby's questioning of the officers about the shooting. Mrs. Waggoner mentioned removing a recorder from the Defendant's shirt pocket. However, officers never recovered the recorder, and the Defendant never turned it over to them.

After interviewing the Defendant, Special Agent Corbett interviewed Mr. Kolton Waggoner. Officers took multiple photographs of him, including one in which he was pointing to his left temple where he alleged he had been struck with the victim's stick. Special Agent Corbett did not see any visible injuries on Mr. Kolton Waggoner. Although Mr. Kolton Waggoner stated that he had been hit on his shoulder, there were no black marks, soot, or other damage to his shirt or hoodie that he was wearing when the shooting occurred.

Special Agent Corbett noted inconsistencies between the statements of the Defendant and Mr. Kolton Waggoner, as well as inconsistencies between their statements and the evidence at the scene. Special Agent Corbett requested a second interview with the Defendant, who agreed to participate. The interview began at 10:23 p.m. on the day

following the shooting. The Defendant waived his rights and gave a second written statement.

The Defendant stated that around 8:30 p.m. to 9:00 p.m. on the night of the shooting, he smelled what he believed to be a fire, but he did not see a fire beside the victim's house. The Defendant did not recall his son checking on the smell outside. When the Defendant went outside to speak to his son at approximately 9:00 p.m., he did not see the victim walking along the highway, and he did not recall his son telling him that the victim was walking along the highway. The Defendant did not recall a discussion with his son about checking on vacant property next to the victim's home.

The Defendant stated that he and his son were walking on the south side of the highway when the Defendant realized that the victim was behind them. The Defendant said that when the victim came at them with a "bat/stick," the victim hit Mr. Kolton Waggoner first. The Defendant did not know if his son attempted to run away to avoid getting hit by the victim. The Defendant believed the victim was after both of them and did not recall the victim chasing Mr. Kolton Waggoner down. The Defendant did not know the number of times that the victim hit Mr. Kolton Waggoner with a stick, and the Defendant said he lost track of his son once the victim hit his son. The Defendant did not know where his son was when the Defendant shot the victim.

The Defendant stated that he shot the victim because he believed the victim would kill him and his son. The Defendant said that when he "opened fire," he was standing in the roadway in the area of the south side ditch, and the victim was on the south side of the yellow line and approximately six or seven feet away. The Defendant maintained that he believed the victim was close enough to attack him. The Defendant stated that when he pointed the gun at the victim, the victim had the "bat/stick" in "his right hand placed behind his shoulder ready to strike" the Defendant. The Defendant was "certain" that the victim was not at the ditch line on the north side when he was shot, and the Defendant stated that he was on the south side of the road at the ditch line and was running out of space. The Defendant did not know where the cartridge casing that ejected from his gun went and said the cartridge casings generally ejected to his right. He stated that he shot the victim four times because he believed the victim was still capable of killing him with the "bat/stick." The Defendant never saw his son pull out his gun during the incident. After giving this second statement, the Defendant was arrested. Special Agent Corbett testified that the Defendant's statement that he was on the south side or Waggoner side of the highway at the time of the shooting was not consistent with the evidence at the scene.

Special Agent Corbett testified that he doubted that Mr. Kolton Waggoner was struck by the victim. Special Agent Corbett subpoenaed Mr. Kolton Waggoner's medical records from his visit to an emergency room the day after the shooting. According to the

- 11 -

records, Mr. Kolton Waggoner complained of a head and shoulder injury as a result of being struck with a stick by a neighbor. Other than his complaints of tenderness and pain and discoloration in his left shoulder, an examination and a CT scan of his head, face, neck, and shoulder revealed no injuries.

The State called Mr. Kolton Waggoner as a witness at trial, and he maintained that the victim struck him on the head, neck, and shoulder. He identified a photograph of himself with a black mark on his neck, which he stated resulted from the victim's striking him with a stick. He acknowledged that no other black markings were on his head, his shoulder, or the clothing he was wearing at the time of the shooting. He said the victim may not have struck him with the end of the stick each time. He had pain in his shoulder and was unable to lift his arm.

Mr. Kolton Waggoner stated that while he only recalled one strike, "the injuries show that there had to be more than one." He said the victim was strong and estimated that the victim was approximately six feet, four inches or six feet, five inches tall and weighed approximately three hundred pounds. He did not recall whether he lost consciousness during the attack. He testified that he sought medical treatment the next day at 10:00 a.m. or 11:00 a.m. and that he learned of the Defendant's arrest while en route to the hospital. He acknowledged that his medical records stated that he arrived at the hospital at 12:50 p.m. While he did not recall whether he was prescribed medication for the pain; he said he did not have a prescription filled and took ibuprofen for the pain.

Mr. Kolton Waggoner testified that on the night of the shooting, he was at his family's shop building when he saw the victim at a fire next to the victim's house. He watched the victim for thirty to forty minutes as the victim stirred the fire with a stick and then walked down the road while still holding the stick. Mr. Kolton Waggoner and the Defendant grew concerned about a nearby vacant property due to recent break-ins and decided to check on the property.

Mr. Kolton Waggoner testified that the Defendant was on the south side of the road and that he was behind the Defendant when the Defendant shot the victim. Mr. Kolton Waggoner told the police officers that the victim "was positioned on the north side ditch line taking a step off of the grass onto the road." The victim started coming at them, and the Defendant shot him. Mr. Kolton Waggoner agreed that when the victim started coming at them, the victim already had struck him. He said that the victim fell backwards but that he did not actually see the victim fall. He did not recall the victim swinging his stick at the Defendant.

Mr. Kolton Waggoner testified that the victim, generally, was loud, that his voice would echo, and that he could be easily heard when he was yelling. Mr. Kolton

Waggoner stated that the victim was yelling at first, but he was unaware of any neighbors coming out to the scene.

On cross-examination, Mr. Kolton Waggoner testified that everything happened quickly and that he did not have a specific recollection of the events. He did not know whether the victim swung the stick at the Defendant. He stated that the Defendant shot the victim because the victim had injured Mr. Kolton Waggoner and was still coming at him.

**The Defendant's Proof**

The Defendant testified that the animosity between his family and the Woodbys began when the Defendant, who then operated The Gun Shack on his property, refused to sell a gun to the victim because the victim had a felony conviction. When the victim stated that he would send his wife to purchase a gun, the Defendant stated that he would not sell a gun to Mrs. Woodby because it would be considered a "straw purchase." The victim became upset and left. The Defendant stated that Mrs. Woodby tried to purchase a gun from him, that he refused to sell a gun to her, and that she became angry, cursed him, and left. The Defendant said the victim began screaming at him when the Defendant was test-firing a gun a few days later. The Defendant denied that the victim asked him to stop firing guns while the victim recovered, and the Defendant denied cursing and ordering the victim off his property.

The Defendant testified that he had security cameras posted at his store as required by law, as well as outside of his home. He explained that he began using a police scanner because the Woodbys were calling the police on his family so often, and he stated that he began recording activity from the scanner to document the complaints. He stated that his family began recording the Woodbys using handheld video cameras following an incident during which the victim threatened Mr. Kolton Waggoner. The Defendant said that although he contacted the police as a result of the victim's threat, the officers informed him that they needed recordings that were of better quality and with the time and date on them. The Defendant explained that his family recorded the Woodbys in an effort to refute the Woodbys' claims to the police against the Waggoners. The Defendant further explained that his family recorded the bus stops used by the Woodbys' grandson because Mrs. Woodby had claimed that whenever the bus arrived, the Defendant or one of his family members came outside with a shotgun. The Defendant maintained that he did not intend to incite the Woodbys by recording them.

The Defendant testified regarding the various threats that the victim made against his family and stated that the victim appeared to focus primarily upon Mr. Kolton Waggoner. The defense played a video recording of the victim from May 2013 during

- 13 -

which he was walking around with a shotgun.  The Defendant testified that he was afraid of the victim and that his concern for his son's safety increased due to the victim's continued threats against his son.  The Defendant explained that his comments about killing the victim during an audio-recorded telephone conversation in May 2013 occurred after an incident during which the victim threatened Mr. Kolton Waggoner at a nearby convenience store.  The Defendant stated that the victim outweighed his son by almost two hundred pounds, and the Defendant feared that the victim was going to beat his son to death just as he had been threatening to do.

The Defendant testified that he did not believe the victim when he offered to end their dispute.  He stated that although the victim asked to end the dispute on August 30, the victim then threatened them on six different occasions between September 2 and September 10.  The Defendant said he put together a packet of information to send to various people and entities on September 10 as a way to ask for help.  He said the victim's threats toward Mr. Kolton Waggoner were becoming more violent leading up to the day of the shooting.

The Defendant admitted to acting petty during the course of the dispute with the Woodbys and explained that his name-calling was an act of frustration.  He said he contacted the Social Security Administration because he did not want the victim defrauding taxpayers.  The Defendant also contacted the Environmental Protection Agency ("EPA") to complain about the victim's burning in his yard.

The Defendant testified that on the night of the shooting, he and his son went on a walk to spend some time together.  Shortly after they began walking, the victim came up from behind them and began screaming and shining his flashlight at them.  Initially, the victim was twenty to twenty-five feet away from them, and it was dark outside.  The victim continued to approach them while screaming.  The Defendant said that the victim hit Mr. Kolton Waggoner with a stick, and the Defendant believed the victim would kill Mr. Kolton Waggoner.  The Defendant testified that the events occurred quickly and that "before I know it, Kolton is being beaten with the club and then [the victim] is coming at me, and I end up shooting him."  The Defendant stated that he drew his firearm and ordered the victim to stop multiple times but that the victim failed to do so.  The Defendant did not know where he was when he shot the victim or where his son was when the victim attacked him.  The Defendant agreed with his statement to officers that everything occurred in close proximity to where the victim fell.

The Defendant testified that after shooting the victim, he radioed for his wife to call 911.  He stated that he and his family regularly communicated using walkie-talkies and that he had to wear an earpiece to hear the communications because he was deaf in his left ear.  The Defendant returned to his home where he called 911 while his wife

tended of his son's injuries. The Defendant said he requested two ambulances, one for his son and one for the victim. His son was unable to use his arm, so the Defendant instructed him to put ice on it. When his wife asked what happened, he stated that the victim came out of the dark and attacked them and that the Defendant defended them the best that he could.

The Defendant testified that while officers were interrogating him the second time, he continuously told them that he did not know or did not remember details. He said that the officers became more aggressive and that he was tired and was trying to answer their questions despite his uncertainty. He stated that at one point, he laid his head on the table and stated that he was tired and could not remember. He also stated that he was ashamed of his statements mocking Mrs. Woodby during his conversation with his wife following his initial questioning by police. He maintained that he never wanted to kill or injure the victim.

On cross-examination, the Defendant acknowledged that he previously had pointed a gun at another neighbor when the neighbor's dog bit his wife. He also acknowledged that he was holding his gun when he confronted the victim on September 10. He testified that he had recorded his neighbors when he lived in Indiana when a "small issue" arose. He also recorded the children in his neighborhood in Indiana on numerous occasions while they played.

The Defendant agreed that he and his family chose to walk in front of the Woodbys' residence on a daily basis even though his family knew that it agitated the Woodbys and despite the availability of other areas in which to walk. The Defendant also agreed that despite his concern over his son's safety due to the victim's threats, he continued to allow his son to walk up and down the highway in front of the Woodbys' residence. The Defendant acknowledged that he did not like the Woodbys and that he referred to the victim as "schizo" and "fat bastard" and referred to Mrs. Woodby as "fat b***h."

The Defendant had the Woodbys' dates of birth written in a notebook in his home because he was attempting to obtain their background reports. He agreed that he derived "[a] little bit" of satisfaction believing that he destroyed the victim's chances of receiving disability benefits. He also agreed that he called the EPA to aggravate the victim and in hopes that the EPA would cause the victim problems. The Defendant also reported the victim to DCS but was unaware of DCS ever removing the Woodbys' grandchild from their home.

One of the Waggoners' video recordings was of an incident involving the victim that began when the Defendant yelled out, "Do you have a problem, fat bastard?" as the

- 15 -

victim was pulling into his driveway. The Defendant testified that he yelled at the victim because the victim had been yelling at the Defendant's children. The Defendant and Mr. Kolton Waggoner, both of whom had guns at their sides, walked down the hill and to the edge of their yard to confront the victim. The Defendant testified that he did not see a firearm on the victim. Mr. Kolton Waggoner pushed the victim, who then hit him. Mr. Kolton Waggoner pointed his gun at the victim, while the Defendant's wife yelled that the victim was going to jail. The Defendant called the police, and the victim was arrested but was never charged with a criminal offense.

The Defendant testified that the Woodbys falsely accused the Waggoners of shooting their dog. The State played a video recording taken by the Waggoners, which showed a black dog on their property. The dog walked out of the view of the camera, and multiple gunshots could be heard. The victim walked outside, and Mr. Kolton Waggoner yelled that the victim's dog was on his property and shouted, "Keep that frigging thing over there and it wouldn't be dead." The Defendant denied that his son shot the dog and said his son was "[a]pparently" joking. The Defendant acknowledged that their behavior was not consistent with someone who just wanted to be left alone.

Although the Defendant maintained that he required an earpiece to hear the radio due to deafness in his left ear, he was able to hear radio communication in the courtroom. He explained that he did not need an earpiece to hear the radio in a quiet environment and acknowledged that it was quiet when he was outside prior to the shooting. He stated that he did not need the earpiece on the night of the shooting but had needed it earlier that day. He denied that the purpose of the earpiece was to hear someone over the radio without giving way his location.

The Defendant testified that he shot the victim as the victim was swinging the stick in his right hand. The Defendant acknowledged that he had time to aim his gun when he shot the victim. He did not recall where he was when the shots were fired. He agreed that he told the officers on multiple occasions that the shooting occurred on the south side or the Waggoner side of the highway. He denied that he had a recorder in his shirt pocket when the shooting occurred.

The defense also presented evidence regarding Mr. Kolton Waggoner's claims of injuries from an attack by the victim. The defense called Detective Steve Rouse, who responded to the scene and assisted Special Agent Corbett in interviewing the Defendant. Detective Rouse testified that when he arrived at the scene, he saw Mr. Kolton Waggoner standing in the driveway while waiting for medical attention. He had a black mark or smudge on his neck. Detective Rouse stated on cross-examination that the scratch of Mr. Kolton Waggoner's neck did not appear to be fresh, and Detective Rouse did not see any soot on Mr. Kolton Waggoner's shoulder or clothing.

- 16 -

Detective Rouse also testified that while interviewing the Defendant, he never saw the Defendant lay his head on the table or almost fall asleep. Detective Rouse did not recall the Defendant stating that he was tired and could not "see straight." While the Defendant appeared to be crying at one point during the interview, Detective Rouse did not see any tears. Detective Rouse stated that Special Agent Corbett wrote down exactly what the Defendant said and that the Defendant was allowed to make changes to his statement. Detective Rouse stated that the type of earpiece worn by the Defendant, generally, was used to keep from being discovered while working a scene, as the earpiece allowed the person to hear radio communication without anyone else around the person hearing it.

The defense also presented the testimony of Mr. Danny McKinney, a paramedic who examined Mr. Kolton Waggoner at the scene. Mr. McKinney stated that Mr. Kolton Waggoner was holding his left arm and shoulder and reported that he had been struck with a pipe. He had red marks on his left arm and neck, complained of a "massive headache," and had limited range of motion in his arm. Mr. McKinney testified that Mr. Kolton Waggoner's injuries were consistent with having been hit with a pipe or a stick. Mr. Kolton Waggoner reported a pain level of eight on a scale of one to ten. Mr. McKinney explained that a pain level of ten is the type of pain felt from breaking every bone in your body, while a pain level of eight is consistent with the type of pain felt from a gunshot wound. Although someone with a pain level of eight would have elevated blood pressure, Mr. Kolton Waggoner's blood pressure was not elevated, and he was alert to person, place, time, and events.

In rebuttal, the State presented the testimony of Mr. Israel Wilkerson, an EMT, who was with Mr. McKinney at the scene. Mr. Wilkerson did not believe Mr. Kolton Waggoner was in pain because he refused to go to the hospital and Mr. Wilkerson did not observe any injuries on Mr. Kolton Waggoner's head or shoulder. Mr. McKinney told Mr. Wilkerson that he did not believe that Mr. Kolton Waggoner had been injured.

The jury convicted the Defendant of second degree murder, and the trial court sentenced him to eighteen years' incarceration. The Defendant filed a motion for new trial, which the trial court denied.

## ANALYSIS

On appeal, the Defendant challenges: (1) the sufficiency of the evidence supporting his conviction; (2) the trial court's failure to grant a change of venue; (3) the trial court's failure to grant a new trial due to juror misconduct; (4) the investigator's failure to record the statements of the Defendant and the Defendant's son; (5) the

- 17 -

admission of testimony from the forensic pathologist related to crime scene reconstruction; (6) the trial court's exclusion of the recording of the Defendant's 911 call; (7) the trial court's exclusion of evidence of the victim's conduct directed at the Defendant and his family; and (8) the trial court's denial of the Defendant's request for access to the audio recordings of the trial.

## I. Sufficiency

The Defendant contends that the evidence is insufficient to support his conviction for second degree murder and that the evidence, instead, establishes that he killed the victim in self-defense and in defense of his son. The State responds that the evidence is sufficient to support the conviction. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(20); *see also* T.C.A. § 39-11-302(b). Second degree murder is a result-of-conduct offense. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). The

Tennessee Supreme Court has determined that the "statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder." *Id*.

The trial court provided the jury with an instruction on self-defense. Tennessee Code Annotated section 39-11-611(b) (Supp. 2012) sets forth the requirements of a claim of self-defense as follows:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged is unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. T.C.A. § 39-11-201 (a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether the defendant acted in self-defense is a matter for the determination of the jury as the trier of fact. *State v. Dooley*, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The trial court also instructed the jury on "defense of another." Tennessee Code Annotated section 39-11-612 permits a person to use deadly force "to protect a third person" when the person using deadly force "reasonably believes" that the third person would be justified in using deadly force under the self-defense statute and that "the intervention is immediately necessary to protect the third person." "The application of the right to defend another should be 'determined in the same fashion as the right of self-defense' under [section] 39-11-611." *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn.

2013) (quoting T.C.A. § 39-11-612 Sentencing Comm'n Cmts.). "A person's right to defense of a third party is no greater than the third party's right to defend himself or herself." *Id.* (citing *State v. Barnes*, 675 S.W.2d 195, 196 (Tenn. Crim. App. 1984)). Just as the State has the burden of negating a claim of self-defense, the State also has the burden of negating a claim of defense of another. *See* T.C.A. § 39-11-201(a)(3) (providing that the State has the burden of negating any defense beyond a reasonable doubt if admissible evidence is introduced supporting the defense). A claim of defense of another also is essentially a question of fact for the jury. *See State v. Marquette Houston*, No. W2006-00095-CCA-R3-CD, 2007 WL 1890650, at *6 (Tenn. Crim. App. June 29, 2007).

The evidence, when viewed in the light most favorable to the State, established that the Defendant and his family had been harassing the victim and his family for a long period of time. The Waggoners constantly recorded the Woodbys, including their grandson as he played outside and boarded the school bus. One bus driver was so concerned with the Waggoners' behavior that the bus stop was moved to another location. The Defendant and his adult son routinely displayed weapons while walking in front of the victim's home in an attempt to intimidate the victim. The Waggoners detonated explosives on their property that would rattle their neighbors' homes. There was evidence that Mr. Kolton Waggoner shot the victim's dog. The Defendant contacted multiple governmental agencies and made claims against the victim. Although the Defendant testified that he and his family acted in an effort to protect themselves from the Woodbys' false allegations, a reasonable jury could conclude that the Waggoners were harassing the Woodbys in an effort to provoke them and that the victim's threats and outbursts were the result of the Waggoners' provocation. The Defendant expressed delight in his ability to agitate the victim during an audio-recorded conversation with his family. The Waggoners' continued harassment of the victim and his family demonstrated that they did not take the victim's threats seriously and that they wished to continue to provoke the victim. They ignored the victim's attempts at reconciliation and, instead, continued their harassment of the Woodbys.

The Defendant discussed his willingness to kill the victim during a recorded telephone conversation months before the shooting. He had previously threatened to shoot the unarmed victim if the victim took "one step" after the Defendant and his son provoked an outburst by the victim. A reasonable juror could infer that the Defendant was prepared to kill the victim and believed a minor infraction would justify lethal force.

The physical evidence does not support Mr. Kolton Waggoner's testimony at trial or the Defendant's statement to the police that the victim was shot while on the south side or the Waggoner side of the highway. Rather, the physical evidence supports the inference that the victim was shot close to where his body was discovered in the ditch on

- 20 -

the north side or the Woodby side of the highway. No blood was found on the south side of the highway, and the only blood found at the scene was located near the victim's body. The bullets entered the victim's body in a downward trajectory, and the ditch line where the victim's body was found was the lowest elevation. Also found near the victim's body were the cartridge casings, which ejected from the Defendant's gun between three and five o'clock and three to five feet away, and the victim's walking stick, flashlight, and cigarette butt. The victim had a bullet stuck to his skin, which was removed by officers with little effort. The jury could reasonably have concluded that it was unlikely that the Defendant shot the victim four times while the victim was on the south side of the road after which the victim made his way to the other side of the street without bleeding and while holding onto his flashlight, a walking stick, and a cigarette until he fell in the ditch line.

Furthermore, a reasonable and legitimate inference from the evidence was that the victim was not raising his stick and attacking the Defendant or his son when the Defendant shot him. The victim was shot on his right side. One of the bullets passed through his flashlight before entering his right shoulder, and the position of the holes in the flashlight indicated that the victim was holding the flashlight up in his left hand when he was shot. The evidence indicated that when the victim was shot in his right forearm, his forearm was in a downward position and close to his abdomen, which was consistent with the victim holding a walking stick by his side when he sustained the wound.

The strongest legitimate view of the evidence was that Mr. Kolton Waggoner was not struck and injured by the victim as he and the Defendant claimed. Although Mr. Kolton Waggoner had a black mark on his neck, he did not have black marks on his clothing or on his head and shoulder where he claimed to have been struck. He had no injuries on his head or shoulder that were visible in photographs, and Detective Rouse testified that the abrasion on Mr. Kolton Waggoner's neck did not appear to be fresh. The Defendant was unable to place Mr. Kolton Waggoner's physical location during the shooting despite his testimony that he shot the victim in order to protect Mr. Kolton Waggoner. Mr. Kolton Waggoner testified that his family remained on the south side of the highway, that the victim was attacking them, and that the victim was paradoxically on the north side of the highway, a few steps into the road. He agreed that when the victim started coming at them, the victim already had struck him. While Mr. Kolton Waggoner estimated that his pain level was an eight out of ten at the scene, Mr. Wilkerson, the EMT who examined him, did not believe he was in pain. He was oriented despite his claim of a head injury, and his blood pressure was not elevated. He did not go to the hospital until the following afternoon after the Defendant was arrested, and he did not follow up with a physician or recall if a prescription was given to him.

Despite the Waggoners' obsession with recording, officers never recovered any recordings of the shooting. The Defendant's wife told him that she had removed a recorder from his pocket, but officers never recovered that recording. The Defendant had the wherewithal following the shooting to place an audio recorder on his police scanner and record the officers' radio communications in response to the shooting. After the Defendant provided his initial statement to the police, the Defendant and his wife calmly discussed the shooting and mocked Mrs. Woodby.

We conclude that, when viewed in the light most favorable to the State, the evidence is sufficient to establish that the Defendant knowingly killed the victim and that he did not do so in self-defense or in defense of his son. The Defendant is not entitled to relief with regard to this issue.

## II. Change of Venue

During a pretrial hearing, defense counsel announced that he planned to file a motion for a change of venue. The trial court noted that the electronic and print media in Knoxville had covered the case extensively but that the court was unaware of the extent to which the media coverage affected potential jurors in Union County. The trial court stated its intentions to make every effort for the case to be tried before a Union County jury. The Defendant did not file a motion for a change of venue. Instead, defense counsel made an oral motion for a change of venue once the jury had been selected in order to "preserve the record." The trial court denied the motion, and the Defendant contends that the trial court erred in doing so.

A criminal offense is to be prosecuted in the county where it was committed, Tenn. R. Crim. P. 18(a), but the trial court "should order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim P. 21(a). A motion for a change of venue "shall be accompanied by affidavit(s) averring facts constituting the alleged undue excitement or other cause on which the motion is based" and "shall be made at the earliest date after which the cause for the change of venue is alleged to have arisen." Tenn. R. Crim. P. 21(b), (c). We note that the Defendant failed to file a motion for a change of venue attaching the affidavits as required by Rule 21(b). This court previously has held that a defendant waived appellate review of the trial court's denial of a motion for a change of venue when the defendant failed to attach affidavits as required by Rule 21(b). *See State v. Fred Birchfield*, No. E2016-00493-CCA-R3-CD, 2017 WL 758515, at *8 (Tenn. Crim. App. Feb. 27, 2017) (citing *State v. Robert Hockett*, No. 89-99-III, 1990 WL 198878, at *3 (Tenn. Crim. App. Dec. 12, 1990)). Nevertheless, we conclude that the trial court did not abuse its discretion in denying the motion.

A motion for a change of venue addresses itself to the trial court's sound discretion, and the trial court's decision will not be reversed absent abuse of discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). "Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice." *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). A court will not presume unfairness based on the quantity of publicity unless the trial atmosphere is "'utterly corrupted by press coverage.'" *Id.* at 387 (quoting *Dobbert v. Florida*, 432 U.S. 282, 303, (1977)). A juror who possesses knowledge of the facts of the case may still be qualified to serve on the panel so long as the juror can demonstrate that he or she will put aside prior knowledge and will decide the case based on the evidence presented at trial. *State v. Rogers*, 188 S.W.3d 593, 621 (Tenn. 2006) (appendix). "The mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue." *State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997) (appendix). Instead, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992).

The factors which a trial court should consider in deciding whether to grant a change of venue include:

the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury.

*State v. Sexton*, 368 S.W.3d 371, 387 (Tenn. 2012) (citing *Rogers*, 188 S.W.3d at 621-22 (appendix) (citing *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979))).

The Defendant does not address these factors in his brief. Rather, he makes a blanket statement that, "[g]iven that the incident took place in a very small rural county close enough to Knoxville to be fully covered by Knoxville print and electronic media,

seating a jury composed of jurors, who were unaware of the allegations and who did not have some contact with one of the individuals involved, would have been impossible." The record does not reflect the nature, extent, and timing of the pretrial publicity, the degree to which the publicity permeated the area from which the venire was drawn, or the time elapsed between the release of the publicity and the trial. Although the potential jurors completed questionnaires regarding the pretrial publicity, the Defendant failed to include in the appellate record any of the completed questionnaires establishing the extent to which any jurors were aware of the case prior to trial. "In the absence of a complete record, we must presume that the trial court correctly denied the motion for a change of venue." *Crenshaw*, 64 S.W.3d at 387.

The Defendant argues that a juror's acknowledgement during the trial that she knew Ms. Jessica Waggoner, one of the bus drivers, supports his claim that a change of venue was warranted. The juror made the trial court aware of this knowledge once Ms. Jessica Waggoner began testifying at trial. The trial court conducted a voir dire of the juror, who confirmed that it would not affect her ability to decide the case. The Defendant did not challenge the juror's continued service on the jury.

The record reflects that the trial court "carefully and meticulously orchestrated the jury selection process to insure that the [Defendant] received a fair trial." *Hoover*, 594 S.W.2d at 746. The record does not reflect whether the Defendant exercised all of his peremptory challenges. Furthermore, the Defendant failed to establish that any members of the jury were biased from exposure to pretrial publicity or any pretrial knowledge of the case or the witnesses. *See Sexton*, 368 S.W.3d at 388 (concluding that the trial court did not abuse its discretion in denying a change of venue motion when there was no indication that the pretrial publicity adversely impacted the jury panel); *Evans*, 838 S.W.2d at 192 (concluding that the defendant did not demonstrate prejudice when the jurors who had been exposed to pretrial publicity stated that they would render a verdict based on the evidence at trial). Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

### III. Juror Misconduct

The Defendant contends that one of the jurors engaged in misconduct by communicating extra-judicially with members of the victim's family, including Mrs. Woodby, and by failing to disclose the juror's relationship with the victim's family during voir dire. The Defendant maintains that the trial court erred in denying his request to subpoena the juror to testify at the hearing on the motion for a new trial in support of his claim of misconduct.

## A. Trial and Post-Trial Proceedings

The juror in question completed a jury questionnaire prior to trial in which she stated that she had no prior knowledge of the case. During voir dire, the juror stated that one of the witnesses had worked in her home several years prior to trial, but the juror could not recall the witness's name. The juror affirmed that her prior knowledge of the witness would not affect her ability to be fair and impartial and that she would render a decision based upon the evidence presented at trial.

When the State called Ms. Jessica Waggoner to testify at trial, the juror informed the trial court that she knew the witness. During a hearing outside the presence of the other jurors, the juror in question testified that her grandson had recently graduated from the Head Start program where Ms. Jessica Waggoner was employed. The juror did not know Ms. Jessica Waggoner on a personal basis and affirmed that her prior knowledge of the witness would not affect her ability to serve as a juror. Neither party objected to the juror's continued service on the jury.

The Defendant subsequently raised the issue of juror misconduct in his motion for new trial. He attached to his petition screenshots of the juror's posts to the victim's tribute page on various social media platforms. Not all of the attached screen shots included dates, but those that did were dated after the trial had concluded. In some of the posts, the juror and Mrs. Woodby communicated with each other regarding the upcoming sentencing hearing, their interest in meeting each other, and the plan for Mrs. Woodby to drive the juror to the sentencing hearing. The juror and Mrs. Woodby referred to each other as "my friend" in some of the exchanges. When Mrs. Woodby expressed sadness due to the victim's absence on Thanksgiving, the juror stated that Mrs. Woodby was welcome in her home and that "I love you."

In other posts, the juror described the Defendant and his family as "evil," expressed her view that the Defendant's sentence was too lenient, and stated that she believed the Defendant's wife and son should also go to jail. The juror stated that she was "proud" to return a guilty verdict against the Defendant and expressed disbelief as to how the Defendant's initial trial ended in a hung jury. The juror also posted a photograph of the Defendant's wife crying in the courtroom and mocked her.

During the hearing on the motion for new trial, defense counsel requested that the trial court allow him to subpoena the juror at issue to testify at a hearing. Defense counsel argued that although the juror denied knowing the victim or his family during voir dire, the juror's social media exchanges with the victim's family suggested otherwise. The prosecutor argued that the exchanges did not establish that the juror had a relationship with the victim's family or any knowledge of the case at the time of trial.

- 25 -

The prosecutor reported that he had spoken to Mrs. Woodby, who stated that while she and the juror attended the sentencing hearing together, they were not acquainted until after the trial. The trial court denied the Defendant's request to subpoena the juror to testify because there was no evidence that the juror had a prior relationship with the victim's family or prior knowledge of the case or that the juror provided misleading information during voir dire.

The State presented Mrs. Woodby as a witness during the hearing. She testified that she did not develop a relationship with the juror until after the trial. She stated that she had never seen or had any contact with the juror prior to the trial, and she was not aware of any contact between the juror and the victim prior to the victim's death. Mrs. Woodby stated that after the verdict, the juror approached members of the victim's family and offered her condolences. She said that after the trial, the juror reached out to Mrs. Woodby's sister-in-law who lived in Michigan, but Mrs. Woodby said her sister-in-law and the juror did not know each other prior to the trial.

On cross-examination, Mrs. Woodby testified that she did not have any contact with the juror during the trial. She did not believe that she told the juror during an exchange on social media in relation to their plans to attend the sentencing hearing together that she could not wait to see the juror because she "had a feeling that [she] had seen [the juror] somewhere before, lol."

Mrs. Woodby testified that a few websites regarding "Justice for Michael Woodby" had been established. She was unsure whether she had communicated with the juror on those websites. She stated that the juror began using different names after the Waggoners started harassing the juror after the trial. Mrs. Woodby maintained that she did not have any contact with the juror prior to trial if the juror was commenting on the websites under a different name because Mrs. Woodby did not respond to anyone on the website whom she did not know.

On redirect examination, Mrs. Woodby testified that all of her social media communications with the juror occurred after the trial and that she did not know the juror prior to trial. On recross-examination, Mrs. Woodby stated that she and her daughter set up a website and that her sister-in-law set up another website. Mrs. Woodby said she did not add the juror to her website and that there was not anyone added to the website whom Mrs. Woodby did not otherwise know.

Defense counsel argued that there were "troubling communications" on social media suggesting that the juror had some prior knowledge of the case. Defense counsel argued that because the juror used different names on social media, other communications could have occurred. He also referred to the juror's attending the

sentencing hearing with the victim's family as "very odd." Defense counsel argued that he had established a sufficient connection as to at least have the juror testify during another hearing. The State responded that the evidence established that Mrs. Woodby had not met the juror prior to trial and that the juror did not begin using different names until after the trial, in response to harassment from the Defendant's family.

The trial court found no evidence that the juror engaged in deception regarding her ability to follow her oath as a juror and to render a fair verdict. The trial court found the juror's actions in informing the trial court of her knowledge of Ms. Jessica Waggoner at trial as "persuasive" evidence that the juror was not attempting to mislead the parties regarding her prior relationships with those involved in the proceedings. The trial court stated that whatever actions the juror took post-trial were "on her."

## B. Analysis

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013) (citing *State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013); *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945)). The Defendant raised two allegations of jury misconduct in his motion for new trial: (1) that the juror at issue failed to disclose her relationship with the victim's family during voir dire; and (2) that the juror engaged in extra-judicial communications with the victim's family during the trial. On appeal, the Defendant challenges the trial court's denial of his request to subpoena the juror who he claimed engaged in such misconduct.

With regard to the Defendant's claim of jury misconduct during voir dire, this court has recognized the importance of guarding the jury selection process to ensure that a defendant is afforded a fair trial and that the verdict is reached by an impartial jury. *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993). "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the underpinnings of our justice system." *Id.* (quotation omitted). A challenge to a juror's qualifications based upon bias, prejudice, or impartiality may be made after the jury verdict. *Id.* at 355.

Voir dire provides for the impaneling of a fair and impartial jury through questions that allow counsel to intelligently exercise challenges. *Id*. at 354. Counsel's full knowledge of the facts that might bear upon a juror's qualifications is essential to the

intelligent exercise of peremptory and for-cause challenges. *Id.* at 355. Jurors, therefore, are obligated to make "'full and truthful answers … neither falsely stating any fact nor concealing any material matter.'" *Id.* (quoting 47 Am. Jur. 2d, Jury § 208 (1969)).

The defendant has the burden of establishing a prima facie case of bias or partiality. *Id.* A presumption of prejudice arises when "a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality." *Id.* The State may rebut the presumption through evidence establishing the absence of "actual prejudice" or "actual partiality." *Id.* at 357. In determining whether the presumption is overcome, the trial court "must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality." *Id.*

With regard to the Defendant's claims of improper extra-judicial communications, our supreme court has recognized that a jury's exposure to extraneous prejudicial information or improper outside influence during trial renders the validity of the verdict "questionable." *Adams*, 406 S.W.3d at 650 (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). "[E]xtraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (citations omitted). "An improper outside influence is any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

When challenging the validity of a jury's verdict, the defendant "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651. If the defendant makes this initial showing, there is a rebuttable presumption of prejudice, and the burden shifts to the State to present admissible evidence explaining the conduct or demonstrating that it was harmless. *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). Because the jury in this case was not sequestered, the Defendant must show something more than an extra-judicial communication between a juror and a third party to shift the burden to the State. *Smith*, 418 S.W.3d at 48. The Defendant must present "evidence that, as a result of the extra-judicial communication, some extraneous prejudicial fact or opinion 'was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors.'" *Id.* (quoting *Blackwell*, 664 S.W.2d at 689).

This issue in this case does not involve a trial court's failure to hold an evidentiary hearing in light of a defendant's claims. *See id.* at 48-49 (holding that the trial court erred in failing to hold an evidentiary hearing when the trial court received during deliberations "reliable and admissible evidence" of an extra-judicial communication between a juror

and a witness). The trial court in this case held an evidentiary hearing during which Mrs. Woodby testified. Rather, the issue is the trial court's denial of the Defendant's request to subpoena the challenged juror to testify at such a hearing.

As our supreme court has stated,

> when misconduct involving a juror is brought to a trial court's attention, "it [is] well within [the judge's] power and authority to launch a full scale investigation by summoning … all the affiants and other members of the jury, if need be, with a view of getting to the bottom of the matter, and this, if necessary, upon [the judge's] own motion."

*Id.* at 46 (quoting *Shew v. Bailey*, 260 S.W.2d 362, 368 (Tenn. Ct. App. 1951)). Courts have recognized the "general reluctance to 'haul jurors in after they have reached a verdict in order to probe for potential instances of … misconduct.'" *State v. James Webb*, No. 02C01-9512-CC-00383, 1997 WL 80971, at *11 (Tenn. Crim. App. Feb. 27, 1997) (quoting *United States v. Infelise*, 813 F. Supp. 599, 605 (N.D. Ill. 1993)); *see United States v. Vitale*, 459 F. 3d 190, 197 (2d Cir. 2005). Such post-verdict inquiries may lead to the harassment of jurors, the inhabitation of jury deliberations, an increase in meritless pleadings, an increased temptation to tamper with the jury, and an uncertainty in jury verdicts. *Vitale*, 459 F.3d at 197. As the United States Supreme Court has explained:

> Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussions in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (internal citations omitted).

As a result, an inquiry into juror misconduct is not justified by "'potentially suspicious circumstances.'" *John Johnson v. State*, No. W2007-02847-CCA-R3-PC, 2009 WL 2970520, at *8 (Tenn. Crim. App. July 14, 2009) (quoting *State v. Robert Emmet Dunlap, Jr.*, No. 02C01-9801-CC-00009, 1998 WL 641338, at *3 (Tenn. Crim. App. Sept. 21, 1998). "'Something more than unverified conjecture must be shown.'" *Id.* (quoting *Robert Emmett Dunlap, Jr.*, 1998 WL 641338, at *3); *see United States v. Noel*, 905 F.3d 258, 275 (3d Cir. 2018) (holding that a trial court did not abuse its discretion in denying a motion for new trial without a hearing when the defendant only offered speculation of jury misconduct).

In the present case, the Defendant presented no evidence, either through his attachments to his motion for new trial or during the evidentiary hearing, that the juror knew the victim and his family prior to trial or that the juror engaged in extra-judicial communications with members of the victim's family or any other third party about the case during trial. Most of the social media communications between the juror and members of the victim's family attached to the Defendant's motion for new trial were dated after the trial. Those communications that were not dated discussed matters such as the upcoming sentencing hearing and the result of the sentencing hearing, all of which occurred after the trial. Furthermore, some of the communications referred to the juror and Mrs. Woodby looking forward to meeting, indicating that they were not yet acquainted. Mrs. Woodby testified that neither she nor her family knew the juror and that they had no contact with her until after the trial, and the trial court credited Mrs. Woodby's testimony. The Defendant only offers speculation that the juror's testimony could establish juror misconduct. Thus, we conclude that the trial court did not err in denying the Defendant's request to subpoena the juror. Because the Defendant has failed to produce evidence that the juror failed to disclose material information during voir dire or that the juror engaged in improper extra-judicial communications during the trial, the Defendant is not entitled to relief on this issue.

## IV. Failure to Record Statements

The Defendant challenges the State's use of his statements and his son's statement to law enforcement on the basis that the investigator did not electronically record the interviews and the statements. The Defendant, however, has waived this issue because he did not file a motion to suppress the statements prior to trial or object to the State's use of the statements on this basis at trial. *See* Tenn. R. Crim. P. 12(b)(2)(C) (requiring that a motion to suppress evidence be filed prior to trial); Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). The Defendant does not allege that the use of the statements amounted to plain error, and, therefore, we decline to review the issue for plain error. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016) (providing that the defendant has the burden of establishing that the trial court committed plain error). We also note that our supreme court has held that neither the federal nor the state constitution requires electronic recording of police interrogations. *See State v. Godsey*, 60 S.W.3d 759, 771-72 (Tenn. 2001). The Defendant is not entitled to relief regarding this issue.

## V. Testimony of the Medical Examiner

The Defendant asserts that the trial court erred in admitting Dr. Lochmuller's testimony regarding the possible positions of the victim and the shooter when the victim sustained the gunshot wounds. The Defendant contends that such testimony fell within the purview of a crime scene reconstructionist and that Dr. Lochmuller was not qualified to offer such testimony.

At trial, the State questioned Dr. Lochmuller about the position of the victim and the shooter if the shooter was shorter than the victim and in light of testimony that the bullets entered the victim in a downward trajectory. Dr. Lochmuller testified without objection that it was possible that the victim was squatting down or leaning toward the area from where the bullets were coming, that the shooter was positioned at a higher point than the victim and was shooting downward, or that the shooter held his gun at a higher position when he was shooting. The State asked, "Most folks don't shoot pistols like this, do they, Dr. Lochmuller…?" Dr. Lochmuller responded that he did not know. Defense counsel objected on the basis of speculation, and the trial court overruled the objection, finding that Dr. Lochmuller was "testifying as an expert in his field."

The Defendant never objected at trial to Dr. Lochmuller's testimony regarding the possible positions of the victim or the shooter. The Defendant did not argue at trial that such testimony fell within the purview of crime scene reconstruction, about which Dr. Lochmuller was not qualify to testify. Instead, defense counsel objected to the State's question regarding how most people hold a gun as calling for speculation. Because the Defendant failed to object to the testimony that he now challenges on appeal, he has waived the issue. *See* Tenn. R. App. P. 36(a). The Defendant does not allege that the admission of the testimony amounted to plain error, and, therefore, we decline to review the issue for plain error. *See Martin*, 505 S.W.3d at 505. The Defendant is not entitled to relief regarding this issue.

## VI. Exclusion of the Recording of the Defendant's 911 Call

During the Defendant's testimony at trial, defense counsel sought to introduce the recording of the Defendant's 911 call. The State objected on the basis of hearsay. Defense counsel argued that the Defendant's statements were admissible as excited utterances and statements of "present sense impression." The trial court held a hearing outside the presence of the jury during which the recording of the 911 call was played. During the call, the Defendant reported, "I've got shots fired; I've got man down." He requested two ambulances, one for his "neighbor" who "attacked us" and one for his son who had been "beat[en] with a bat or stick or something." The Defendant stated that his neighbor was shot, but the Defendant did not know the extent of the injuries. The

Defendant could be heard saying, "Sit down and get ice on it," and asking his wife about the extent of Mr. Kolton Waggoner's injuries. Mr. Kolton Waggoner said his arm might be broken. The Defendant stated that "he" attacked them and that the Defendant defended his son "the best I knew how." The 911 operator stated that several officers were en route, and the Defendant responded that one officer had just arrived.

The trial court found that the statements in the recording were hearsay and that the statements were not admissible as excited utterances because there had been no showing that the statements were made "under a particular threat of … emotional peril." The trial court excluded the recording upon finding that the recording simply reiterated the Defendant's testimony and was being used to bolster his testimony.

The Defendant contends that the trial court erred in excluding the recording of his 911 call and argues that the statements in the recording fell within hearsay exceptions as statements of "present sense impression" and excited utterances. The State responds that the Defendant's statements in the recording were hearsay and did not fall within any hearsay exceptions. We agree with the State.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

The Defendant argues that his statements in the recording were statements of "present sense impression" and, thus, fell within an exception to the rule prohibiting hearsay. Federal Rule of Evidence 803(1) recognizes this exception and defines "present sense impression" as "[a] statement describing or explaining an event or condition, made while immediately after the declarant perceived it." However, this exception is not included in the Tennessee Rules of Evidence. *See State v. Carpenter*, 773 S.W.2d 1, 9 (Tenn. 1989); Neil P. Cohen, et al., *Tennessee Law of Evidence* § 8.07[9] (6th ed. 2011).

An exception to the rule prohibiting hearsay that is included in the Tennessee Rules of Evidence is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In order for the exception to apply (1) there must be a startling event or

condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement. *State v. Land*, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). The rationale behind the exception is that (1) because the statement is made spontaneously in response to a startling event, there is little opportunity for reflection or likelihood of fabrication and (2) that the statement will accurately reflect events while they are fresh in the declarant's mind. *State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997) (citing Cohen, *Tennessee Law of Evidence* § 8.03(2).1 at 532 (3d ed. 1995). The declarant must also have personal knowledge of the facts in the hearsay statement in order for the exception to apply. *Kendrick*, 454 S.W.3d at 479. The statement ought to be so spontaneous that it "preclude[s] the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

The State concedes that the shooting was a startling event and that the Defendant's statements related to the shooting. The State, however, maintains that the Defendant's statements were not made while under stress or excitement. Our supreme court has recognized that

> [t]he "ultimate test" under this prong is whether the statement suggests "spontaneity" and whether the statement has a "logical relation" to the shocking event. When "an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication," this prong may be satisfied.

*Kendrick*, 454 S.W.3d at 478 (quoting *Gordon*, 952 S.W.2d at 820). In determining if the declarant is under the stress or excitement of the startling event, the court may consider the interval between the event and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook, and circumstances of the declarant. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). The declarant's circumstances include age and physical or mental condition. *Kendrick*, 454 S.W.3d at 478. "[T]he 'length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance.'" *State v. Banks*, 271 S.W.3d 90, 116-17 (Tenn. 2008) (quoting *Rickey Williams v. State*, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007)). The contents of the statement, which might indicate the degree of the declarant's stress, can also be considered. *Kendrick*, 454 S.W.3d at 478. The court may also consider whether the statement is made in response to an inquiry or whether it is self-serving. *Id.* at 479. "[W]hen a statement is made in response to an inquiry or when the statement is self-serving, these factors may show the statement was the result of reflective thought." *Id.*

The requirement that the statement be made under stress or excitement "relates most directly to the underlying rationale for the exception." *Gordon*, 952 S.W.2d at 820.

While the trial court did not make extensive factual findings, we conclude that the record supports the trial court's determination that the statements in the recording did not meet the requirements of the excited utterance exception. Specifically, the Defendant failed to establish that his statements were made while under stress or excitement. While it appears that the Defendant called 9-1-1 a short time after the shooting, he did not sound emotional, distraught, or excited. While he was winded and sounded frustrated at times, he primarily sounded calm. The Defendant's word choice during the call illustrated a lack of emotion and spontaneity. He used what the State accurately describes in its brief as "clinical police jargon," such as "I've got shots fired; I've got man down," and he never referred to the victim by name. Moreover, the Defendant's statements were primarily self-serving. Evidence during the State's case-in-chief that the Defendant had the wherewithal to place an audio recording device on his police scanner either shortly before or shortly after calling 9-1-1 to record the police officers' response to his call is another factor supporting a finding that the Defendant's self-serving statements were the result of reflective thought. Because the evidence does not preponderate against the trial court's determination that the Defendant was not under the stress of excitement when he called 9-1-1, the finding is binding on appellate review. We conclude that the trial court did not err in excluding the recording.

The Defendant offers a one-sentence contention in his brief that the trial court's exclusion of the recording violated his constitutional right to present a defense. The Defendant failed to present any argument in his brief to support his claim. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must include an argument "setting forth ... the contentions of the appellant with respect to the issues presented, and the reasons therefor ... with citations to the authorities ... relied on); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Defendant also failed to raise this issue at trial. *See State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (observing that "issues raised for the first time on appeal are waived"); *see also State v. Bryan Kevin Thomas*, No. E2017-02247-CCA-R3-CD, 2019 WL 1858525, at *10 (Tenn. Crim. App. Apr. 29, 2019), *no perm. app. filed* (holding that the defendant waived his argument that the trial court's exclusion of evidence violated his constitutional right to present a defense when the defendant raised it for the first time on appeal). Accordingly, this issue is waived.

## VII.  Exclusion of Evidence Regarding the Victim's Prior Conduct and Threats

The Defendant contends that the trial court erred in excluding the testimony of Mrs. Sharon Hicks, a former neighbor, regarding the victim's conduct and threats against the Waggoners.  The State responds that the trial court did not abuse its discretion in excluding the evidence and that any error was harmless.

Following the Defendant's testimony at trial, the defense sought to present the testimony of Mrs. Hicks regarding the victim's prior conduct.  During a jury-out hearing, Mrs. Hicks testified that in June 2013, she and her husband rented a home from the Woodbys that was located behind the Woodbys' home.  She witnessed conflicts between the Woodbys and the Waggoners almost every day.  She stated that the victim regularly purchased a case of beer, drank beer all day, became intoxicated, and began yelling at the Waggoners from across the street.  She also stated that the victim exposed himself while on the roadway on more than one occasion.  She explained that the Waggoners recorded the victim so people could see what they had to endure from the victim.

On cross-examination, Mrs. Hicks denied that she was friends with the Waggoners when she lived near them.  She and her husband moved in August 2013 when the victim placed a lock on their electrical unit.  Mrs. Hicks said that the victim did not like her and her husband and that the victim needed a tenant who would "corroborate his stories."

Defense counsel argued that Mrs. Hicks's testimony regarding her observation of the victim's behavior toward the Waggoners was admissible in light of the State's claim that the Waggoners provoked the victim.  The State responded that her testimony was cumulative in light of other evidence presented at trial and was "just bolstering testimony."  The trial court agreed with the State that the evidence was cumulative and found that the testimony did not establish "a basis for self-defense or defense of a third [person]."  The trial court also found that the "chance of confusion is much higher than anything that she might help this jury with."

The trial court allowed defense counsel to recall Mrs. Hicks, who testified regarding a conversation that she overheard between the victim and her husband following an altercation between the victim and the Waggoners a few weeks into August of 2013.  Mrs. Hicks testified that the victim stated that he was tired of the Waggoners recording him and that "if he ever got a hold of Kolton, he was going to kill him."[1]  The

---

[1] Mrs. Hicks also testified that following an altercation between the victim and the Waggoners, the victim apologized to her for shooting a gun over her head.  On appeal, the Defendant does not challenge the trial court's exclusion of this testimony.

trial court excluded the testimony, finding that the testimony was cumulative and that there was no proof that the Defendant was aware of the threat.

We conclude that any error in the exclusion of this evidence is harmless in light of the other evidence presented at trial regarding the victim's aggressive behavior and threats directed toward the Waggoners. *See* Tenn. R. App. P. 36(b); *State v. Saylor*, 117 S.W.3d 239, 249-50 (Tenn. 2003) (holding that the trial court's erroneous exclusion of evidence that the victim made a threat against the defendant on the day of the victim's death was harmless in light of other evidence presented at trial that the victim was the first aggressor). Our supreme court has stated that "'nonconstitutional errors will *not* result in reversal unless the error affirmatively appears to have affected the result of the trial on the merits.'" *Saylor*, 117 S.W.3d at 249 (quoting *State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999)). In the present case, the jurors saw numerous video recordings of the victim screaming and cursing at the Waggoners and threatening to kill Mr. Kolton Waggoner. The jury learned that the victim previously had been arrested for attacking Mr. Kolton Waggoner and that the victim had a criminal history. Accordingly, we cannot conclude that any error in the exclusion of additional evidence regarding the victim's yelling and threats affirmatively appeared to have affected the result of the trial.

## VIII. Denial of Access to the Audio Recording of the Trial

The Defendant contends that the trial court erred in denying him access to the audio recording of his trial in order to correct the trial transcript. The State responds that any error did not result in prejudice because the Defendant failed to establish what the recording might have revealed that differed from the trial transcript. We agree with the State.

After filing a motion for new trial, the Defendant filed a motion requesting a copy of the recording of the trial in which he maintained that he and his family reviewed the trial transcript and believed that material was omitted from the transcript. The Defendant asserted that the recording was a public record and that he was willing to pay for a copy of the recording. During a hearing, the trial court denied the Defendant's request. The trial court stated that the recordings were only a backup and that if there was a claim of a problem with the transcript, the trial court and the court reporter would listen to the recording. The trial court stated that no one had identified any issues with the transcript.

On appeal, the Defendant contends that the recording of the trial was a public record and that he is entitled to a copy of the recording pursuant to the Tennessee Public Records Act. *See* T.C.A. § 10-7-101, *et. seq.* However, pursuant to section 10-7-505 (b), a citizen who has been denied access to a public record must obtain judicial review by filing a petition in chancery court, a procedure with which the Defendant failed to

comply. Nevertheless, this court has recognized that a defendant convicted of a felony offense as "a statutory right to have a verbatim recording and transcript of all proceedings of his trial and sentencing hearing." *State v. Gregory Bernard Grier*, No. M2003-03003-CCA-R3-CD, 2005 WL 1981802, at *6 (Tenn. Crim. App. Aug. 11, 2005); *see* T.C.A. § 40-14-307(a). Furthermore, the Defendant, who was declared indigent by the trial court, has a constitutional right under the Due Process and Equal Protection Clauses for the State to provide him "with a 'record of sufficient completeness' to permit proper consideration of the issues the defendant will present for review." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (quoting *Draper v. Washington*, 372 U.S. 487, 446 (1963)). A "record of sufficient completeness" is not without its limits as it "does not translate automatically into a complete verbatim transcript." *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971). Rather, "[a]lternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise." *Draper*, 372 U.S. at 495.

We cannot conclude that the Defendant has been denied "a record of sufficient completeness" for purposes of appeal or that the denial of access of the recording of the trial otherwise resulted in prejudice. While the Defendant makes a general allegation that the trial transcript omits certain material, he fails to specify what that material might be or how it relates to the issues he raises on appeal. Accordingly, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE